MONTANA ORE PURCHASING CO., Respondent, *v.*
BOSTON & MONTANA CONSOLIDATED COPPER
AND SILVER MINING CO., Appellant.

[No. 1,315.]

[Submitted January 18, 1899. Decided February 13, 1899.]

*Mining Rights—Injunction—Judicial Discretion.*

1. Judicial discretion is not to be interfered with on appeal, unless it clearly appears
   that that discretion has been abused; but this is not to be interpreted as granting to
   the District Courts "unlimited discretion," the exercise of which is not to be revised
   by the Supreme Court. Legal discretion must always be guided and controlled by
   certain legal principles.
2. It was an abuse of discretion to deny a motion to vacate a temporary injunction in a
   mining suit, where defendant was working veins within its own ground, and there
   was a mere "chance" or "vague possibility," that these veins might have their
   apexes within plaintiff's property.

*Appeal from District Court, Silver Bow County; William
Clancy, Judge.*

Suit by the Montana Ore Purchasing Company against the
Boston & Montana Consolidated Copper and Silver Mining
Company. From an order denying a motion to dissolve a
temporary injunction, and modifying the injunction, defend-
ant appeals. Reversed.

Statement of the case by the Justice delivering the opinion.

Action in damages by plaintiff (respondent) against defend-
ant (appellant) for ores extracted from certain mineral veins,
the apexes of which the plaintiff claims to have. Defendant,
by answer, put in issue all material averments of the com-
plaint.

Plaintiff claims ownership of the veins by reason of its
ownership of certain portions of the Johnstown lode claim,
and alleges that the veins upon which defendant was working
have their apexes within plaintiff's surface claims. The por-
tions of the Johnstown owned by plaintiff are illustrated by

the diagrams published in the case of *Montana Ore Purchasing Co.* v. *Boston & Montana Consolidated Copper & Silver Mining Co.*, 20 Mont. 336, 51 Pac. 159. Reference to these diagrams shows that the ground owned by plaintiff is a strip only of the Johnstown lode claim, running northwest and southeast. The other portions of the Johnstown are owned by defendant. Included in such other portions, and towards the southwesterly end, is a strip lying south of the plaintiff's ground, and north of the Pennsylvania lode claim, all of which is defendant's property. To the east of this piece of the Johnstown, and north of defendant's Pennsylvania claim, lies a strip of mining ground known as the "Snow Bird," the property of the Anaconda Mining Company. When this action was begun, defendant was mining within the limits of the Pennsylvania lode claim, at a point some 600 feet distant from the surface line of plaintiff's property.

On *ex parte* application of plaintiff, defendant was first enjoined by temporary order from entering upon or working any veins within a vertical plane drawn downward at the surface, one through the east end line of the Johnstown claim, and the other through the west end line of that portion of the Johnstown owned by plaintiff, which line lay in the direction of S., 25 deg. W., 235 feet, continuing southerly so as to intersect the veins or lodes lying southerly from the Johnstown claim, and having their apexes therein, and which underlie a plane drawn at an angle of 40 deg. from the horizontal from the north line of the Pennsylvania claim.

Upon motion to vacate the injunction order, a hearing was had. The motion was overruled, but the first order was modified by temporary restraining order enjoining defendant from mining upon that certain vein designated by defendant as its vein No. 3, and from extracting ore from all veins within the Pennsylvania lode claim lying north of said vein No. 3, and from the continuations of said veins as claimed by plaintiff to the west. The injunction order recited, further, that the modified order applied only to such vein or ore bodies above mentioned within the Pennsylvania lode claim and to

Sketch of Outcrop.

Section L-L with No.3 and No.7 Penna Veins

the south thereof, and all the portion thereof which lay between a plane passed through the east end line of the Johnstown lode claim, extended to an intersection therewith, and a plane drawn through a west end line of the portion of the Johnstown owned by plaintiff, continued in its own direction until it intersects the west end line of the Pennsylvania lode claim, or that line produced. The diagrams serve to better illustrate the position of the several claims referred to. There was a further modification, by which defendant was not prevented from doing development work, but was required to store all ore extracted.

The injunction order also contained the following command: "It is further ordered that you, the said defendant, your officers, attorneys, agents, servants and employes, and all persons acting through or under you, be, and you are hereby, enjoined from commencing or prosecuting any action in law or equity against this plaintiff for or in respect to the several matters alleged in its complaint, or for and in respect to the ownership of the vein, lode and deposits of ores lying within the above-mentioned boundaries and plaintiff's claim of right thereunder, until the further order and judgment of this court."

Defendant appeals from the order denying the motion to dissolve and modifying the temporary injunction.

*Forbis and Evans* and *Wm. H. De Witt*, for Appellant.

Citing: *Sherman* v. *Clark*, 4 Nev. 138; *Lyon* v. *Woodman*, 7 M. R. 493; *St. Louis M. & M. Co.* v. *Montana Mining Co.*, 58 Fed. 129; *Mexican Ore Co.* v. *Mexican G. Mining Co.*, 47 Fed. 357; 10 Ency. of Pleading and Practice, Title "Injunctions," pp. 988 and 992, and notes; *Rowley* v. *Van Benthuysen*, 16 Wend. 373.

*R. B. Smith*, *John J. McHatton* and *Clayberg & Corbett*, for Respondent.

Citing: *B. M. Con. Min. Co.* v. *M. O. P. Co.*, 89 Fed.

529; *Boyd* v. *Des Rozier et al.*, 52 Pac. 533; *Heinze* v. *B. & M. Co.*, 52 Pac. 273; *Tyler Mining Co.* v. *Last Chance Mining Co.*, 90 Fed. 18.

HUNT, J.—Defendant, on the motion to dissolve, after introducing maps showing the relative positions of the veins and claims involved, put in its evidence which consisted principally of the testimony of mining engineers who are in charge of and familiar with the workings of the Pennsylvania and other of defendant's lode claims. From their testimony we collect the following: When this action was brought, defendant was working in No. 3 vein, as shown on the diagram, on the plane of a section 621 feet from the Pennsylvania claim, at the point where No. 3 vein is nearest to the north side of the Pennsylvania claim. Upon the trial of a suit entitled "Morse v. The Montana Ore Purchasing Company," pending in the Federal Courts, this plaintiff had designated a tract of country, indicated on the map, as a mineralized zone having its apex in the plaintiff's Rarus claim, but such zone lay east of defendant's No. 3 vein, which was not one of the veins of such zone. Plaintiff's witnesses had sworn to this effect in said former suit, and had claimed that the hanging wall of such zone was quite a distance north of defendant's No. 7 vein, as shown on the diagram used. Witnesses said that No. 3 vein would probably have its apex 600 feet south, and No. 7 also many feet south, of any ground owned by plaintiff; that plaintiff had never done any development work to demonstrate where the apex of the vein they claim is; that, on the trial of the above referred to suit in the Federal Court, plaintiff's witnesses had sworn that in the Pennsylvania shaft, close to the end line where a crosscut had been driven, there was no vein, and defendant's experts said on this hearing, if that were so, it would be impossible for the apexes of the No. 3 and No. 7 veins to come within plaintiff's ground at all. Witnesses also said that a 40 degree line, as fixed by the court's order, cut right through No. 7 vein, and all that portion of the vein beneath the line could not be worked; that the crosscuts shown

upon a section map introduced (marked "L-L") ran right in the hanging wall rock of the zone as claimed by plaintiff, and that the 40 degree line is steeper than the veins, and would intercept the section in which No. 3 vein would lie.

The cross-examination elicited that, so far as any veins showed which were developed by the plaintiff towards the surface lying east of the west end line of the Johnstown, they had their apexes in the plaintiff's ground; that the strike of No. 3 vein on the 600-foot level underneath the Pennsylvania surface, as compared with the direction of the Johnstown side line, is approximately parallel, and the apex of said No. 3 vein would lie very close to the south side line of the Pennsylvania claim; that in the trial in the Federal Court defendant's contention was that there was nothing to justify the theory of a zone, but, if there was a zone, it would embrace the whole of Butte City; that some of the stopes made on the ore body had one dip, others another; some of the ore bodies were vertical, others dipped 45 degrees to the south; that there are two veins between what had been termed the east and west faults—one with a dip of about 65 degrees, the other of 40 to 45 degrees; that, in places, the vein or veins had a flatter dip, and, following a flat vein to the south on the dip, it would not reach No. 3 and No. 7 veins, but go to the west of them; that there are several faults down in the Pennsylvania claim; that in some places the apex of the vein is 1,000 feet below the surface, but that at one point it is cut by the 40 degree line.

It was also testified to that the apex of the zone claimed by plaintiff is 130 feet on the west end line of the Johnstown, and 300 feet on the plane of the east end line thereof; that it had been claimed by some of plaintiff's engineers in the Federal suit that a crosscut that had been run south from the hanging wall was all in country rock; that others had said there was a small vein up near the north end, but that in its course south there was no vein; that neither of the veins Nos. 3 or 7 had an apex in that portion of the Johnstown owned by plaintiff; that the dip of the Pennsylvania No. 1 vein from

the 400 level to the 500 is about 45 deg., but further east it is a little flatter, so that the plane established by the injunction order would in depth certainly interfere with the defendant's veins, no matter whether the upper portions stood straighter and were above the plane; that at one point in the neighborhood of the Pennsylvania shaft the dip of one vein is 60 degrees; that between the two main fault planes in that country near the surface there is generally crushed and broken-up matter, but below the 350-foot level are apparently two well defined veins—the one to the north considerably steeper than the south one, with a dip to the one of about 38 degrees, in places flatter; that if No. 3 vein were taken at, say, the 600 level, and a line projected to the surface at 50 degrees, it would come out in the Pennsylvania lines; that there is a difference of from 100 to 200 feet to the surface of the ground between the north and south side lines of the Pennsylvania and, if a 38 degree dip were taken, veins Nos. 3 and 7 would be intersected considerably below the points where they are developed; that the apexes of both said veins are beneath the fault in the west drift; that one fault dips southwest; and that the injunction plane line would presently cut any vein lying at a greater angle than 40 degrees south, including the Pennsylvania vein No. 1, where the vein faults below the 400-foot level, the fault passing through the 400-foot floor west of the Pennsylvania shaft.

On the part of plaintiff, the evidence of its engineers was that it is impossible to tell where the ore bodies included in the Pennsylvania claim do apex; that ore bodies are to be found in the Pennsylvania underlying a plane drawn through the north side line of the Pennsylvania claim, and extended to the south at an angle of 40 degrees. These ore bodies lie comparatively flat, particularly on the west side of the east fault, and veins Nos. 3 and 7 may have their apexes in the Johnstown and in all probability they do. These veins have a much flatter dip on the west than on the east side of the fault, as they seem to change their dip passing through the fault. The east fault intersects the veins. No. 3 has ore on

both sides of the fault, and the dip on the west side of the
fault is much flatter, dipping 40 to 45 degrees.    Witnesses
further stated that all the veins that have apexes on the Johns-
town further north dip underneath the Pennsylvania; that
considering the dip of the veins within the side lines of the
Johnstown, and the dip of the vein west of the east fault,
No. 3 vein would probably reach the Johnstown claim; that
No. 7 vein certainly has its apex within the Johnstown side
line; that the east fault, if followed to the surface, might cut
the lower corner of the Pennsylvania, but the fault would
generally be entirely east of the Pennsylvania claim; that no
apexes had been discovered which could be connected with No.
3 or No. 7 veins, there having been no development near the
surface of any of these veins that shows their apexes at all;
but that there is nothing in the Pennsylvania claim which
shows with certainty where the apexes of Nos. 3 and 7 are.

On cross-examination it was developed that all of the ore
streaks lying above a certain point in one the faults have
about a 40 degree dip; below that they are straighter.    It was
also testified to by plaintiff's witnesses that in the No. 3 vein
there were places where it was intersected by the east fault;
that there was a crevice deemed a clay seam; that all of the
ore streaks to the west of the clay seams in the Rarus have a
very flat dip, approching 35 degrees in places; that the strike
of No. 3 vein is about parallel to the side line of the Johns-
town's side line, so far as the workings on the 600 and 700
foot levels show; that, if No. 3 vein were continued on its
present strike and dip, the chances are the cropping would be
to the north of the Pennsylvania north side line; that the
workings disclosed and lying west of the east clay seam or
fault, and made from the Rarus shaft, indicate that the apexes
are in that part of the Johnstown owned by plaintiff; that the
drift run on the 600 level of the Pennsylvania, supposed to be
on the No. 7 vein, is practically in the locality where a drift,
to be made following the vein from the Johnstown surface by
plaintiff, would reach down to the No. 7 vein at the 600-foot
level; that there was a fault in No. 3 vein on the 700 level;

that No. 3 "had a very good chance" of having its apex in the Johnstown; and that, if what plaintiff's witnesses called the "fault vein" did not cut the 3 and 7 veins so they could be followed, "you would pass through the clay seam into what you call the vein, and pass into the Johnstown ground."

In reviewing this case, we have not lost sight of the established rule that the granting or denying of a temporary restraining order by a district court or judge, in mining suits particularly, is a matter of judicial discretion, not to be interfered with on appeal, unless it clearly appears that that discretion has been abused. We affirm that general doctrine, but do not interpret it as granting to the district courts an unlimited discretion, the exercise of which is not to be revised by the Supreme Court of the State. The right of appeal from an order refusing to vacate a temporay order involves the right to have this tribunal review the facts upon which the lower court assumed to exercise judicial discretion, to the end that we shall decide finally whether or not from the decision made by the district court, considering the nature, circumstances, and facts of the case, there has been an exercise of that *judicial* discretion alone comprehended in law. There is no hard and fast rule governing discretion; if there were discretion would have no place; yet no discretion contemplated by the law can be wisely exercised, unless it be guided and controlled by certain legal principles. These principles have as a foundation the surer doing of equity between parties. The exercise of the power of a judge to say injunction shall or shall not issue, without regard to the grounds upon which that power may be exercised, is not judicial discretion. The regulation of the power must always be by the judgment of the court or judge upon the case before him, rather than by his humor to exert the great power he possesses. If the discretion be of the one kind, it is not to be interfered with; but if it be of the other it will be reviewed and overturned, as not appearing to have been made on grounds which find legal reason and support.

In this case it appears clearly to us that the court abused

its discretion.     The evidence discloses that defendant was working within its own ground, and upon veins which have their apexes within its own ground.     The plaintiff's own witnesses frankly said there was not sufficient development made by plaintiff at the time of hearing on this motion for them to say that the apexes of the veins are within plaintiff's ground. The mineral zone referred to in the testimony did not apparently warrant the claim by plaintiff to the veins involved herein, inasmuch as plaintiff's experts had admitted on another trial that, although the zone had been examined to a great depth, it did not show these particular veins as part of it.     A mere "*chance*" that the veins might have their apexes within plaintiff's property is really the only foundation for the injunction order restraining defendant from working the veins within the limits of its own ground; but this "chance" is far too shadowy to warrant a continuance of the order, when we consider the fact that plaintiff's engineers had theretofore testified that these veins did not constitute part of the zone which had its apex in plaintiff's ground, and that no changed conditions appeared to exist since their former opinions had been expressed, to warrant their now saying differently.

There is nothing substantial in the evidence of plaintiff from which the district court could judge that plaintiff was probably right, and that injury would follow a denial of the restraining order pending the determination of the suit.     Injunction orders should not be kept in force, and parties denied the right of working their own mines, upon the vague possibilities that veins within their claims may have their apexes in another owner's ground,—in other words, the writ is not solely for the purpose of preserving the property in *statu quo*, and it will not be granted for that purpose only, unless the party seeking it shows that, if it be not granted, real injury will probably ensue to his rights.     *A fortiori*, it should be dissolved where the party enjoined is within the limits of his own possession, and clearly shows that there is no reasonable probability of his trespassing on plaintiff's property.  Nothing in *Boyd* v. *Desrozier*, 20 Mont. 444, 52 Pac. 53, or *Heinze* v.

*B. & M. Co.*, 20 Mont. 528, 52 Pac. 273, conflicts with our opinion herein, for the facts in those cases were entirely different. So much for the question of discretion.

As what we have said is decisive of the questions before us, we need not consider the unusual order of the court enjoining defendant from commencing or prosecuting any action at law or in equity against this plaintiff in respect to the several matters alleged in plaintiff's complaint, or for or in respect to the ownership of the veins lying beneath the plane established by the court's order, until the further order of the court. No showing was made to justify such a clause in the injunction order, and we know of no authority in the court to make it. We advert to this point merely as going to show that, upon the whole case, the district court has violated the plainest rules which confine its power within the bounds of law and sound legal discretion. (*Butte & B. Consol. Min. Co.* v. *Montana Ore Purchasing Co.*, 21 Mont. 539, 55 Pac. 112.)

The order denying the motion to dissolve and modifying the temporary restraining order issued is reversed, and the cause is remanded for further proceedings, with directions to dissolve the temporary restraining order heretofore issued.

*Reversed and remanded.*

BRANTLY, C. J., and PIGOTT, J., concur.

